THE CITY OF GALVESTON v. THE GALVESTON CITY R. R. Co.

1. CONSTRUCTION OF CONTRACT.—An obligation by the railroad company, that it "shall at all times keep the road-bed of said railroad in good repair, and shall keep said road-bed up to the level of the streets; in no case shall said road-bed be above or below the city grade of the streets, after said streets shall have been graded by the city,"—does not oblige the railroad company to fill up the streets beneath its track, so as to keep its road-bed on a level with the street on each side of the track.

2. SAME.—Such obligation merely required the road to be kept in good repair, and did not bind the company to contribute to the expense of grading the streets, but merely to conform to and keep the level of the road-bed to that of the streets, when graded.

3. RELEASE BY CITY COUNCIL.—It is competent for a city council, when a charter authorizes a railroad company to build the road "under such conditions and ordinances as the mayor and aldermen of said city may provide and require," to release the railroad company from an obligation "to construct and keep in good repair all cross-culverts whenever the same may be required under their rail-tracks."

4. SAME.—Both parties having acted upon an ordinance, is sufficient reason for its support.

5. ESTOPPEL—VOLUNTARY EXPENDITURE.—The voluntary labor and expenditure by a city upon a work, the performance of which, by the railroad company, had been released, without calling upon the company to do the work, will not sustain an action, by the city, for labor and expenditure which were voluntary, even if the release by the city was without consideration.

6. If a contract has been obtained by mistake, or if through change of circumstances it is deemed to operate oppressively, an agreement to make an additional compensation, or to annul or modify it, is not invalid for want of consideration.

APPEAL from Galveston.    Tried below before the Hon. A. P. McCormick.

The city of Galveston, on the 24th day of May, 1866, made a written contract with certain parties named therein and their successors, under which the Galveston City Railroad Company was organized and operated. An act of the Legislature was passed, approved October 8, 1866, by which the company was duly incorporated, in accordance with the provisions of said contract. Said act of incorporation, among other things, provided that "said company shall construct, equip, and run said railroad upon the streets within the limits of said city, under such conditions and ordinances as the mayor and aldermen of said city may provide and impose."

Articles XIII and XV were the basis of the action. Article XIII is as follows: "Said party (meaning the City Railroad Company) shall at all times keep the road-bed of said railroad in good repair, and shall keep said road-bed up to the level of the streets. In no case shall said road-bed be above or below the city grade of the streets, after said streets shall have been graded by the city."

Article XV is in the following language : "Said party (meaning the company) shall construct and keep in good repair all cross-culverts, whenever the same may be required under their rail tracks—said culverts to extend across the street from sidewalk to sidewalk ; and whenever said party shall neglect to construct and keep in order said culverts, the city shall have the right to cause said culverts to be made or repaired at the expense of said party; and in the event of their refusal to pay the same, the amount shall be recoverable before any court of competent jurisdiction, for the benefit of the city."

The company constructed its tracks along several streets, indicated in the agreement, and had since used and operated the same for the purposes of its organization.

On the 8th of November, 1873, the city of Galveston filed this suit against the company, alleging breach of contract on

the part of said company, in having neglected to comply with the terms and conditions of said XIII and XV articles of said contract. The special breaches of contract set up in the petition were, that the defendant failed and refused to fill up to the proper grade certain portions of its road-bed, and to construct certain culverts beneath the same, the necessity for which was great; that the city, by reason of such default, was compelled to and did fill up said road-bed and construct said culverts, at the cost of $5,894.85, for which a recovery was sought.

The defendant pleaded, 1st, general denial; 2d, no liability for the amount claimed; 3d, no notification or demand before suit; 4th, no liability under the contract for the work alleged to have been done; and 5th, release by operation of subsequent ordinance or contract on the part of the city.

By agreement of counsel, the questions of labor and material and the cost thereof were specially reserved for reference to an auditor or master, in the event the law of the case should go against the defendant.

A jury was waived, and the issues of law and fact submitted to the court, which gave judgment for the defendant, from which judgment the plaintiff appealed.

The question presented by the record was, whether the City Railroad Company is liable to the City of Galveston, under article XIII and XV of their contract, for the expense incurred by the city in filling up certain portions of the road-bed of the company, and constructing certain culverts beneath the same. This statement is adopted from the brief of appellee, and is full.

*Walter L. Mann*, for appellant.

*Ballinger, Jack & Mott*, for appellee.

MOORE, ASSOCIATE JUSTICE.—The only questions which we are called upon to decide in this case, by the record now before us, as counsel for both parties agree, are, whether the

City Railroad Company is liable to the city of Galveston for the expenses incurred by the city in filling up certain portions of the road-bed of said railroad company, and constructing culverts beneath the same, under articles XIII and XV of the contract of May 24, 1866, under which said Galveston City Railroad Company was organized, and its road constructed and operated.

Appellant insists, that by art. XIII of this contract, appellee was bound to fill up the streets beneath its track, so as to keep its road-bed on a level with the street, on each side of the track; that by the words "road-bed" and "streets," as used in said article, the contracting parties evidently intended to refer to distinct and separate parts of the streets upon which said road should be constructed. Unquestionably, if it is conceded that the word "street," as used in this article of the contract, does not include or refer to the entire street, but two lateral portions of it, separated by the railroad of said company, it cannot be denied that appellee is bound to keep the ground occupied by its track on a level with the "streets," after they are graded by the city. But to assume that these words were thus used, while admitting, as counsel does, that "the 'road-bed' was physically a part of the 'street,'" is to beg the question in issue. The plain import and evident purpose of this article, whether considered by itself or in connection with other parts of the contract, neither requires or admits of the construction given by appellant's counsel to this article of the contract, or to these words, from which he attempts to deduce it.

It was evidently the purpose of the city to require the company to so construct and keep its road, as to interfere as little as possible with the use of the streets by the general public. Hence it was stipulated, that the road-bed should be kept, at all times, in good repair, and up to the level of the streets. And in view of the fact that the city might find it necessary or desirable, from time to time, in the future, to increase or diminish the level or grade of the streets on which

the road might be constructed, it was further stipulated, that in no case should the road-bed be above or below such grade, after the street had been graded by the city—thereby clearly showing, we think, that it was not intended by this article of the contract to require the company to contribute to the expense of grading the streets, but merely to conform to and keep the level of its road-bed to that of the street when graded.

If it had been intended that the company should bear the expense of grading that part of the street occupied by its track, evidently other stipulations would have been made than those found in this article. Waiving comment upon the fact that the obligation of the company to fill or cut down that part of the street occupied by its track, if it exist, is a mere inference from its obligation to keep its road-bed to the level of the streets after they are graded by the city, it is obvious that the city could not have left it to the discretion of the company how or with what character of material the part of the street occupied by the road should be filled, consistently with its evident purpose and duty, of merely permitting the use of its streets by the company, subordinate to its will and general plan of government. Evidently, the city might deem it necessary that some of its streets should be graded with much more expensive material, and in a much more substantial manner than others; or experience might demonstrate the necessity for the use of a different material from that with which it might have been first filled; yet there is no stipulation that the company shall be bound further than to keep its road-bed to the level of the city grade. Could it do this with any material it should select, without regard to that used by the city in grading the other parts of the street? It can hardly be conceived that there would be no reference whatever to so important a matter, if it had been intended or supposed that by this article the company had undertaken and bound itself for the performance of a

matter of such pecuniary moment and general interest, both to the company and the city.

The language of article XV of the contract is plain and unmistakable. It requires the company to "construct and keep in good repair all cross-culverts, whenever the same may be required under their rail-tracks." As to this, there is no dispute; but while the company was required by the original contract to construct and keep these culverts in repair, they were subsequently relieved by the city from this undertaking, by an ordinance, in almost as plain and unmistakable terms as the original contract. That such is the obvious import of this ordinance, is not denied by counsel for appellant. It is insisted, however, that it is inoperative and void for want of consideration. But if we were to concede that the city received no valuable consideration for it, we do not perceive how it could affect this case. Certainly the city, if it saw fit to do so, might release the company from the performance or fulfillment of an undertaking such as this, which, at the time of the release, was altogether *in futuro,* and upon which, therefore, there had been no default. If a contract has been obtained by mistake, or if, through change of circumstances, it is deemed to operate oppressively, an agreement to make an additional compensation, or to annul or modify it, is not, as is well settled, invalid for want of consideration. (1 Dillon on Municipal Corporations, sec. 398.)

The charter of the company authorized the building of the road "under such conditions and ordinances as the mayor and aldermen of said city may provide and impose." Certainly, the construction and operation of the road, under the conditions provided and imposed by the subsequent ordinance, is as valid and binding upon the city and company as by the original ordinance under which the company was organized. Both parties having acted upon the ordinance, this is a sufficient consideration for its support; and appellant, having made the culverts without calling upon appellee to do so, is estopped from demanding payment for its volun-

tary labor and expenditures, if said ordinance was, in fact, without consideration.

There being no error in the judgment, it is affirmed.

AFFIRMED.